## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**RUSSELL ARDEN,**
**500 John King Road**
**Cressview, FL 32549**

      **Plaintiff,**

     **v.**

**DOUGLAS COLLINS, in his official**
**capacity as Secretary of the**
**Department of Veterans Affairs,**
**810 Vermont Street, N.W.**
**Washington, D.C. 20024**

      **Defendant.**

**Civil Action No. _____**

**JURY TRIAL DEMANDED**

## COMPLAINT

**NOW COMES** Plaintiff, Russell Arden, by and through undersigned counsel, and brings this action against Defendant Douglas Collins, in his official capacity as Secretary of the Department of Veterans Affairs (the "Agency" or "VA"), for unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and alleges as follows:

### JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this case arises under the laws of the United States, and pursuant to 42 U.S.C. § 2000e-16(c), which provides district courts with jurisdiction over Title VII claims against federal agencies.

2.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) and 42 U.S.C. § 2000e-16(d), as the Defendant is an agency of the United States and the unlawful employment practices alleged herein were committed in the District of Columbia or affected employment decisions made in the District of Columbia.

1

3.      Plaintiff has exhausted his administrative remedies. On July 26, 2023, Plaintiff initiated contact with the VA's Office of Resolution Management, Diversity and Inclusion ("ORMDI"). On September 20, 2023, Plaintiff filed his formal EEO complaint (EEOC No. 570-2025-00377X; Agency No. 20DR-005-2023-153364). On July 22, 2024, the EEOC Office of Federal Operations reversed the Agency's dismissal of the complaint and remanded for investigation, finding that Plaintiff stated a valid retaliation claim. On January 15, 2026, the EEOC Administrative Judge granted Defendant's Motion for Summary Judgment. The Agency issued its Final Order on January 21, 2026. This action is being brought within ninety (90) days of the Agency's final action. Plaintiff has complied with all applicable procedural requirements and is entitled to bring this civil action. 42 U.S.C. §2000e-16(c).

## PARTIES

4.      Plaintiff Russell Arden is a citizen of the United States and a resident of the Commonwealth of Virginia. Mr. Arden is a veteran of the United States Armed Forces with a 100% service-connected disability rating. Since September 2020, he has been employed by the VA's Office of Information and Technology as a Supervisory Information Technology Program Manager ("SITPM").

5.      Defendant Douglas Collins is sued in his official capacity as the Secretary of the United States Department of Veterans Affairs. The VA is an agency of the United States Government and is subject to the requirements of Title VII of the Civil Rights Act of 1964.

## FACTUAL ALLEGATIONS

**A. Plaintiff's Employment and Protected Activity:**

6.      Since September 2020, Mr. Arden has been employed by the VA's Office of Information and Technology ("OIT") as a SITPM. Throughout his employment, he has consistently been at least a fully successful performer.

7.    Mr. Arden is also a veteran rated as having a 100% service-connected disability.

8.    Beginning in early 2021, Mr. Arden engaged in activities protected under Section 704 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, when he provided evidence in support of an EEO complaint made by his subordinate, Mr. Erick Davis, an African American employee.

9.    Mr. Davis's EEO complaint charged Ms. Tanya Gonzales, an OIT supervisor, with unlawful discrimination and harassment based on Mr. Davis's race.

10.    As part of the investigation into Mr. Davis's complaint, Mr. Arden was interviewed by Ms. Royce Allen, an African American EEO investigator. Mr. Arden provided evidence that he had observed Ms. Gonzales engaging in discriminatory and harassing conduct toward Mr. Davis.

11.    During that interview, Ms. Allen expressly assured Mr. Arden that there would be no retaliation or reprisal for providing truthful testimony.

12.    Mr. Woodie Robinson, an African American supervisor and Ms. Gonzales's direct supervisor, also provided evidence supporting Mr. Davis's allegations during the EEO investigation.

13.    Upon completing her investigation, Ms. Allen concluded that Mr. Davis had been discriminated against and harassed by Ms. Gonzales and recommended that Ms. Gonzales be reprimanded.

14.    On July 9, 2021, the Agency issued Ms. Gonzales a Letter of Reprimand based on the findings of the Davis investigation.

**B. Ms. Gonzales's Grievance and the Whittington Report:**

15.    On February 12, 2021, Ms. Gonzales sent an email to the Agency's ORMDI describing conduct by Mr. Arden and others that she characterized as creating a "hostile work environment."

Significantly, nowhere in this email did Ms. Gonzales contend that the alleged hostile work environment was because of her gender or any other protected classification.

16.     In Spring 2021, Mr. Arden was notified by his supervisor, Mr. Robinson, that Mr. Robinson wanted to conduct mediation sessions between himself, Ms. Gonzales, and Mr. Arden. Mr. Arden was interested in this process because he believed it could resolve any perceived issues and guide Ms. Gonzales toward a more collaborative and productive working relationship. However, Ms. Gonzales refused to participate in the mediation.

17.     In 2021, Mr. Arden was never notified that Ms. Gonzales ever filed an informal or formal complaint with ORMDI, the Agency's Harassment Prevention Program ("HPP"), or with Employee Relations/Labor Relations ("ER/LR").

18.     After receiving the Letter of Reprimand, Ms. Gonzales filed a grievance. A Grievance Examiner, Mr. William Whittington, investigated the grievance and issued a report on August 26, 2021.

19.     In her grievance, Ms. Gonzales requested the following specific relief: (a) that her reprimand be rescinded and removed from her personnel record; (b) that she be reinstated to a supervisory position with equivalent responsibility; and (c) that she be reassigned to a different work unit. According to the Grievance Examiner's report, Ms. Gonzales did not request any relief regarding investigation of alleged hostile work environment claims or that the Agency's Office of Information Security ("OIS") evaluate supervisory training processes.

20.     The Grievance Examiner's report included several recommendations, including Recommendation (d): that Ms. Gonzales's complaint of a "hostile work environment" against Mr. Davis, Mr. Zemke, and Mr. Arden be fully investigated. Critically, this recommendation targeted

the same individuals who had provided testimony against Ms. Gonzales in the Davis EEO investigation.

**C. Mr. Cunningham Deliberately Declines to Adopt Recommendation (d) of the Whittington Report:**

21.    On October 12, 2021, Deputy Assistant Secretary and Chief Information Security Officer ("CISO") Paul Cunningham, as the deciding official on the grievance, issued a memorandum reducing Ms. Gonzales's discipline to a Letter of Counseling.

22.    In his memorandum, Mr. Cunningham specifically noted that two of the Grievance Examiner's recommendations—including Recommendation (d) regarding the hostile work environment investigation—"went beyond the scope of the relief requested" by Ms. Gonzales.

23.    A Grievance Examiner's recommendations are advisory—the deciding official retains discretion to adopt, modify, or reject each recommendation. Mr. Cunningham exercised this discretion when he chose to implement some recommendations (mitigating the reprimand) while leaving Recommendation (d) unimplemented.

24.    Mr. Cunningham confirmed that Ms. Gonzales found her reassignment to be an acceptable solution and asked her to let him know if she had any additional concerns regarding her grievance.

25.    Mr. Cunningham remained with the Agency until February 2022—over four months after issuing his October 2021 memorandum. During this time, Mr. Cunningham took no action to implement Recommendation (d). His non-implementation was a deliberate decision, not an administrative oversight or failure to act.

26.    After receiving Mr. Cunningham's October 12, 2021, Memorandum, Ms. Gonzales took no action to inquire about whether any follow-up had been done regarding Recommendation (d) until March 28, 2023—seventeen months later.

**D. Ms. Sherrill's Retaliatory Campaign Against Those Who Testified in the Davis Investigation:**

27.    In February 2022, Ms. Lynette Sherrill succeeded Mr. Cunningham as CISO.

28.    On or about June 29, 2022, several months after assuming her position, Ms. Sherrill excoriated Mr. Robinson about his "handling" of the Davis EEO complaint. During this meeting, Ms. Sherrill repeatedly told Mr. Robinson that she was "heated" about how Mr. Davis's complaint against Ms. Gonzales had been handled.

29.    Ms. Sherrill falsely accused Mr. Robinson of lacking leadership, failing to follow proper processes, neglecting to properly report the incident, and failing to introduce mediation— accusations that were demonstrably untrue.

30.    Ms. Sherrill angrily berated Mr. Robinson, repeatedly stating "I know the whole story and know what happened and I am heated over it" and that he and "other leaders" had "wronged" Ms. Gonzales.

31.    Ms. Sherrill faulted her predecessor, telling Mr. Robinson that "previous Executive Leadership [Paul Cunningham]" had "totally mishandled the situation" and that they should not have been in SES positions.

32.    When Mr. Robinson attempted to explain that all appropriate steps had been taken, including multiple mediation sessions, Ms. Sherrill cut him off, reiterating that "I know the whole story and know what happened, and I am heated over it."

33.    On information and belief, Ms. Sherrill and Ms. Gonzales were personal friends who were connected on social media, including Facebook.

34.    Following this meeting, Ms. Sherrill took a series of materially adverse actions against Mr. Robinson, including: (a) removing him from the Material Weakness Group Board and from his role as the Material Weakness Executive Committee's Chair, and as the TSS Contract lead; (b)

systematically excluding him from decision-making meetings concerning his areas of expertise; (c) undermining Mr. Robinson's leadership by openly denigrating him to his subordinates; and (d) directly thwarting Mr. Robinson's opportunities for promotion to GS-15 positions.

35.    Ms. Sherrill's retaliatory conduct toward Mr. Robinson was severe and sustained. After Mr. Robinson attempted to explain that he had followed all appropriate procedures in handling the Davis complaint—including properly reporting the complaint, cooperating in the investigation, maintaining appropriate documentation, conducting mediation sessions, and taking appropriate supervisory action—Ms. Sherrill dismissed his explanations and continued her campaign against him.

36.    As a direct result of Ms. Sherrill's retaliatory actions, Mr. Robinson filed an EEO complaint against Ms. Sherrill alleging race discrimination and retaliation. Mr. Robinson's complaint detailed Ms. Sherrill's pattern of adverse actions against him, all of which commenced after Ms. Sherrill learned of his role in supporting the Davis EEO complaint and properly supervising Ms. Gonzales.

37.    Ms. Sherrill also retaliated against Ms. Royce Allen, the EEO investigator who conducted the Davis investigation and concluded that Mr. Davis had been discriminated against and harassed by Ms. Gonzales. Ms. Allen's investigation and recommendation that Ms. Gonzales be reprimanded formed the basis for Ms. Gonzales's discipline.

38.    Ms. Allen filed her own EEO complaint against Ms. Sherrill, alleging discrimination and retaliation. In Ms. Allen's complaint, Ms. Sherrill was named as the Responsible Management Official ("RMO")—the management official whose conduct was the subject of the complaint.

39.    Thus, by mid-2023, Ms. Sherrill had been named as the retaliating official in EEO complaints filed by three individuals involved in the Davis matter: (1) Mr. Robinson, who

supervised Ms. Gonzales and supported the Davis investigation; (2) Ms. Allen, who investigated the Davis complaint and recommended discipline for Ms. Gonzales; and (3) Mr. Arden, who provided testimony supporting Mr. Davis's allegations.

40.    This pattern of retaliation against everyone involved in the Davis EEO matter—the complaining witness (Mr. Davis), the supervisor who supported the investigation (Mr. Robinson), the investigator who found discrimination (Ms. Allen), and the corroborating witness (Mr. Arden)—demonstrates that Ms. Sherrill harbored her own retaliatory animus, independent of and in addition to serving as Ms. Gonzales's instrument of retaliation.

41.    Both the Robinson and Allen EEO complaints were well-known and openly discussed in the OIS workplace. Mr. Arden was aware of Ms. Sherrill's vindictive campaign against his colleagues, which made his own fears of retaliation for his participation in the Davis investigation entirely reasonable.

**E. Ms. Gonzales Lobbies Her Friend Ms. Sherrill to Resurrect Unadopted Recommendation (d) from the Whittington Report:**

42.    On March 28, 2023—seventeen months after receiving the Cunningham Memorandum and thirteen months after Mr. Cunningham's retirement—Ms. Gonzales contacted her friend, Ms. Sherrill, to inquire about the "status" of her hostile work environment allegations. This was relief that Ms. Gonzales had never sought in her grievance and had never pursued through an EEO complaint.

43.    Ms. Gonzales did not merely "inquire" about the status of a recommendation—she actively lobbied for an investigation targeting the individuals who had testified against her in the Davis investigation.

44.     The next day, on March 29, 2023, Ms. Sherrill responded to Ms. Gonzales, stating that "OIS leadership takes all claims of a hostile work environment seriously and that we will be looking into through an informal fact finding."

45.     Contrary to her representation, Ms. Sherrill initiated a formal, rather than informal, investigation into Ms. Gonzales's phantom complaint.

**F. The 2023 Investigation Was a New Decision, Not Implementation of a Prior Directive From the Agency's ORMDI:**

46.     On June 1, 2023, Ms. Angela Williams was appointed to conduct a fact-finding investigation. The scope of the investigation was described as "an investigation into Ms. Gonzales' allegation of a hostile work environment"—the very issue that Ms. Gonzales never pursued in 2021 by filing an ORMDI complaint and did not identify as relief being sought in her grievance.

47.     When Ms. Sherrill and Mr. Keith DeSilva (Ms. Sherrill's Chief of Staff) initiated the investigation in 2023, they were not continuing Mr. Cunningham's work—they were making an independent decision to resurrect a recommendation that their predecessor had deliberately declined to adopt.

48.     Following Paul Cunningham's decision not to implement the Grievance Examiner's recommendation (d) as being beyond the scope of the grievance, it had been pending for over eighteen months with no action before Ms. Gonzales specifically requested it from her friend Ms. Sherrill.

49.     The investigation selectively targeted only those individuals who had testified against Ms. Gonzales: Mr. Davis, Mr. Zemke, and Mr. Arden.

50.     Ordering this investigation violated VA policies, as no complaint or issue was ever filed with ORMDI, the Harassment Prevention Program, or Employee Relations.

51.     Management acknowledged from the outset that timeliness was a problem, yet proceeded anyway—reflecting thatthe investigation's purpose was retaliatory rather than legitimate.

52.     Ms. Sherrill knew or should have known that the investigation was untimely and should never have been initiated. The events at issue occurred in late 2020 and early 2021—more than two years before Ms. Sherrill ordered the investigation in March 2023. Any reasonable manager would have recognized that investigating workplace allegations from over two years prior was procedurally improper and unlikely to yield reliable findings.

53.     Ms. Gonzales likewise knew or should have known that the investigation she requested was untimely and improper. Ms. Gonzales was fully aware that she had never filed a formal EEO complaint or grievance seeking investigation of her hostile work environment allegations. She was also aware that Mr. Cunningham, the deciding official on her 2021 grievance, had deliberately declined to adopt Recommendation (d) and had taken no action on it for over four months before his departure. Ms. Gonzales waited an additional thirteen months after Mr. Cunningham's retirement before contacting Ms. Sherrill—a delay that further demonstrates she understood the matter had been closed.

54.     The fact that both Ms. Sherrill and Ms. Gonzales proceeded despite knowing the investigation was untimely and procedurally improper demonstrates that the true purpose of the investigation was not to address legitimate workplace concerns, but rather to retaliate against Mr. Arden and others who had testified against Ms. Gonzales in the Davis EEO matter.

55.     This knowledge is further evidenced by the fact that the Agency's own Office of People Science ultimately determined the investigation was "unwarranted" and cancelled it in December 2023. If the Agency's internal review concluded the investigation should never have occurred,

then Ms. Sherrill and Ms. Gonzales—who initiated and instigated the investigation, respectively—either knew or were willfully blind to its impropriety from the outset.

**G. Mr. Arden Is Targeted and Coerced into Participation:**

56.    On June 28, 2023, Ms. Williams emailed Mr. Arden, cryptically informing him that she was "conducting a fact finding into the allegations of a 'hostile work environment' that was reported on or about March 5, 2021."

57.    Mr. Arden was shocked to receive this communication, as he was unaware of any pending hostile work environment allegations other than those surrounding the Davis EEO complaint and similar EEO complaints that had been raised by Mr. Robinson and Ms. Allen concerning the actions of Ms. Sherrill after she became CISO in February 2022.

58.    Mr. Arden had major concerns about the timeliness of the investigation, which purported to investigate events from over two years prior.

59.    On June 29, 2023, Mr. Arden responded to Ms. Williams, raising concerns about the timing and scope of the investigation. He informed Ms. Williams that he had included his supervisor, Mr. Robinson, "since the situation of fact finding is over two years since the allegation is out of the ordinary and typically out of the scope of investigation due to the time span involved."

60.    Ms. Williams dismissed Mr. Arden's concerns, directing him to contact Ms. Sherrill's Chief of Staff, Mr. Keith DeSilva, or Ms. CoTrina McCants with any "questions about the directive or authority."

61.    Mr. Arden requested postponement of any interview until he received clarification from Mr. Robinson, EEO, or Employee Relations about why the interview was being conducted.

62.    Subsequently, Mr. Robinson met with Mr. Arden and informed him that he was expected to participate in the interview and that, if he failed to do so, he would be considered insubordinate

and subject to discipline. Ms. McCants confirmed that this was consistent with the Agency's position on employees' mandatory participation in fact-findings.

63.     This threat was particularly coercive because Mr. Arden was actively seeking promotion opportunities to GS-15 positions, and a disciplinary action for insubordination on his record would likely bar him from consideration for any such vacancies.

64.     Mr. Arden's participation in the investigation was not voluntary—he was compelled to participate under threat of disciplinary action for insubordination. This coerced participation in a retaliatory investigation constituted a materially adverse action.

65.     Having no option to decline participation, Mr. Arden met with Ms. Williams on July 6, 2023. Ms. Williams asked Mr. Arden numerous questions about his working relationship with Ms. Gonzales and workplace disruptions and tensions.

66.     Mr. Arden told Ms. Williams that he and his team had attempted numerous times to collaborate with Ms. Gonzales, but those efforts were rejected by her. Mr. Arden told Ms. Williams that Ms. Gonzales's combative attitude frustrated Mr. Arden's team's efforts to fulfill their mission and responsibilities—issues that Mr. Arden had raised several times with Mr. Robinson and the reason why he was interested in mediating those concerns with Ms. Gonzales.

67.     During the interview, it was clear that Mr. Arden was a target of the investigation. Mr. Arden felt intimidated by the process because he had freely given similar testimony previously in the Davis EEO case and reasonably believed that he was being targeted in the renewed investigation into Ms. Gonzales's baseless "harassment" complaint.

**H. Mr. Arden Initiates EEO Contact and the Agency Refuses to Mediate:**

68.     Between June 1, 2023, and July 26, 2023, Mr. Arden was harassed and intimidated by Mr. Robinson and Chief of Staff DeSilva to cooperate in Ms. Williams's investigation.

69.     Mr. Arden's fears of retaliation were reasonable, given Ms. Sherrill's vindictive campaign against his own supervisor, Mr. Robinson, regarding Mr. Robinson's actions concerning Ms. Gonzales's phantom complaint—actions that generated Mr. Robinson's EEO complaint alleging race discrimination and retaliation. Even more directly, Ms. Sherrill was the RMO in the discrimination and retaliation complaint filed by Ms. Royce Allen, who investigated the Davis complaint.

70.     Because it was clear that Mr. Arden was the target of the Williams investigation, he was isolated and ostracized by his supervisor and co-workers, adversely affecting his standing in the office and interfering with Mr. Arden's ability to perform his SITPM job responsibilities. Those employees were fearful that, by associating with Mr. Arden, they would be the next in line for Ms. Sherrill's and Mr. DeSilva's vengeance.

71.     In Summer 2023, Mr. Arden was actively pursuing advancement opportunities to GS-15 positions within the Agency. Being targeted in the investigation was a direct obstacle to these endeavors.

72.     It was clear that Ms. Sherrill, as the service line director, would make the ultimate decision on any recommendations flowing from the Williams investigation.

73.     On July 26, 2023, Mr. Arden initiated contact with ORMDI regarding his retaliation concerns.

74.     On July 31, 2023, Mr. Arden had a telephone interview with an ORMDI representative. That same day, Mr. Arden agreed to mediate his complaint, and a request to mediate was sent to the Agency.

75.     The Agency never responded to Mr. Arden's request to mediate.

76.    On August 12, 2023, Ms. Sherrill asked Mr. DeSilva, her Chief of Staff, "have we been able to conduct the informal fact finding on the harassment that Ms. Gonzales reported multiple times between June 2, 2020, and June 11, 2021?" This communication ignored the critical fact that her friend Ms. Gonzales never intended to pursue a complaint and never filed an ORMDI, HPP/EEO complaint, or grievance concerning such "complaint."

77.    On August 22, 2023, the Agency's ORMDI office sent Ms. Sherrill notification of Mr. Arden's EEO complaint.

78.    On September 20, 2023, Mr. Arden filed his formal EEO complaint.

**I. Ms. Sherrill's Investigation Is Cancelled as Unwarranted—But Retaliation Continues:**

79.    In December 2023, the fact-finding investigation into Ms. Gonzales's phantom complaint was cancelled after being determined to be untimely and unwarranted. Mr. John King from OIT's Office of People Science informed Mr. DeSilva that the investigation had been cancelled. Mr. DeSilva, in turn, informed Ms. Sherrill that the Office of People Science team found that the Gonzales investigation was unwarranted.

80.    The investigation was abandoned only after Mr. Arden filed his EEO complaint—suggesting management recognized its impropriety once legally challenged.

81.    Despite receiving notice that the investigation was cancelled and unwarranted, Ms. Sherrill persisted in seeking resolution. On April 2, 2024, Ms. Sherrill sent yet another request regarding the phantom complaint, noting that it had "lingered for a long time," while ignoring that Ms. Gonzales had never sought the relief recommended by the Grievance Examiner and that Mr. Cunningham had no obligation to pursue or implement it.

82.    Subsequently, and continuing to the present, Mr. DeSilva has continued to harass and intimidate Mr. Arden for pursuing his EEO complaint.

**J. The EEOC Reverses the Agency's Dismissal:**

83.    The Agency initially dismissed Mr. Arden's EEO complaint filed with the ORMDI for failure to state a claim.

84.    On July 22, 2024, the EEOC's Office of Federal Operations ("OFO") reversed the Agency's dismissal and remanded for investigation, finding that Mr. Arden had stated a valid retaliation claim.

85.    The OFO held that an agency's initiating a "bogus investigation" in reprisal for EEO activity states a valid claim and that adverse actions need only be "reasonably likely to deter" protected activity—a standard the alleged retaliatory investigation instituted against Mr. Arden could satisfy.

**K. Continuing Retaliation: Removal from Communications and Exclusion from Meetings:**

86.    Mr. DeSilva's retaliatory actions have included failing to resolve a major issue when Mr. Arden was deleted from an email distribution list. This adversely affected Mr. Arden's ability to remain fully informed of critical communication streams concerning OIS and OIT operations intended for senior leaders and supervisors such as himself.

87.    This disrupted the flow of information and communications that Mr. Arden would receive informing him of situations and actions that were critical for him to do his job and support his subordinates.

88.    These retaliatory actions have included removing Mr. Arden from many meetings he generally attended, alienating him from strategic planning and informational meetings that he would ordinarily attend, and removing him from representing his team and their position regarding the effects of decisions on him and his team.

89.    In December 2024, while Mr. Arden's appeal was pending with the OFO, he was removed from the supervisor and senior leader distribution list.

90.    Once Mr. Arden identified this situation with Mr. DeSilva—since Mr. DeSilva's team manages that distribution list—Mr. DeSilva ignored all of Mr. Arden's email communications.

91.    In March 2025, Mr. DeSilva's team informed Mr. Arden via email that they were directed not to add him back to the list.

92.    After further escalation of the issue, Mr. Arden was finally able to get back on the distribution list in April 2025—a delay of approximately four months.

**L. Continuing Retaliation: Stripping of Supervisory Duties:**

93.    Due to widespread knowledge of Mr. Arden's exercising his Title VII rights by opposing the baseless, untimely investigation, he has been avoided and alienated by most VA OIT and OIS leaders, creating difficulties with the acting department leaders that have taken over for Mr. Robinson since he participated in the Deferred Resignation Program in February 2025.

94.    In April 2025, Ms. Lynette Sherrill approved Ms. Rochika Croall to serve as the Acting Department Chief.

95.    On information and belief, Ms. Croall had been removed as a supervisor for cause in 2021 and should not be in a VA supervisory position.

96.    Ms. Croall has reorganized the department without approval from Human Resources, moving all of Mr. Arden's subordinates under a non-supervisor, thereby diminishing the status of Mr. Arden's position.

97.    Ms. Croall also does not invite Mr. Arden to meetings that a supervisor in his department should be attending.

98.    As a result, Mr. Arden has to learn of decisions and changes through contractors, rather than through his chain of command.

99.    Mr. Arden is now a supervisor in name only.

100.    Mr. Arden has experienced stress, anxiety, and a demonstrable chilling effect on his willingness to participate in future EEO activity.

**M. Continuing Retaliation: Performance Plan Manipulation and Organizational Disruption (2025-2026):**

101.    In addition to the adverse actions described above, the Agency's retaliatory campaign against Mr. Arden intensified in 2025, following Mr. Arden's filing of his EEO complaint and the pendency of his case before the EEOC. These continuing acts of retaliation further demonstrate the Agency's pattern of punishing Mr. Arden for his protected activity.

102.    In May 2025, the Agency changed Mr. Arden's Performance Plan, imposing standards that Mr. Arden reasonably believed were "unrealistic and unattainable." These modified performance standards bore "little or no association or correlation" with Mr. Arden's current position description, making it nearly impossible for him to demonstrate compliance with his assigned duties.

103.    The Agency repeatedly shuffled Mr. Arden between work groups during 2025, moving him from one group to another two times after his Performance Plan was changed in May 2025. This constant reassignment made it nearly impossible to develop and execute the Objectives and Key Results (OKRs) included in his Performance Plan, thereby setting him up for failure.

104.    Since July 2025, the Agency has repeatedly removed and then returned Mr. Arden's subordinate employees to his supervision approximately four times. This shuffling of employees created instability and confusion for both Mr. Arden and his subordinates, who questioned why they were being moved and who was responsible for their performance evaluations.

105.    In late August 2025, the Agency made additional changes to Mr. Arden's performance assignments, reassigning employees with only one month remaining in the rating period. This last-

minute manipulation of reporting relationships undermined Mr. Arden's ability to properly evaluate his subordinates and created anxiety among affected employees about who would rate their annual performance.

106.    The Agency systematically excluded Mr. Arden and his peer supervisor, Ms. Janet Spencer, from organizational planning meetings concerning changes that directly affected their departments. On multiple occasions, contractors were briefed on organizational chart changes and strategic plans before Mr. Arden and Ms. Spencer were informed, undermining their supervisory authority and ability to lead their teams.

107.    On August 22, 2025, Ms. Croall held a meeting with contractors in Frederick, Maryland, without inviting Mr. Arden or informing him in advance. When Mr. Arden discovered the meeting and attempted to participate, he was permitted only limited audio access and was repeatedly put on mute, effectively excluding him from a meeting concerning his area of responsibility.

108.    Multiple employees reported to Mr. Arden that they were confused and concerned because they believed "the contractors are leading the government individuals," which created "chaos among team members" about their proper chain of command. This deliberate circumvention of Mr. Arden's supervisory role further diminished his authority and standing.

109.    Mr. Arden reported these concerns to HR and leadership in writing throughout 2025, but the Agency failed to take any corrective action. The failure to address Mr. Arden's documented concerns further evidences the retaliatory nature of the Agency's actions.

110.    During the 2025 rating period, Mr. Arden received no formal or informal feedback regarding his performance or that anything that was off course. Despite this absence of any counseling or notice of deficiencies, the Agency reduced Mr. Arden's annual performance rating from "Outstanding"—which he had received for five consecutive years—to "Fully Successful."

111.    On January 6, 2026, while Mr. Arden was on sick leave with the flu, the Agency closed out his annual evaluation without any discussion and without providing him an opportunity to address concerns or provide additional information. The timing of this action—occurring while Mr. Arden was medically unable to participate—demonstrates the Agency's intent to deprive him of due process in his evaluation.

112.    Although the Agency had been offered an opportunity to meet with Mr. Arden regarding his evaluation in late November 2025, management chose to schedule the meeting for a day when Mr. Arden was on "use or lose" leave, and then finalized his evaluation the day before he was scheduled to return from sick leave, thereby ensuring he had no opportunity to participate in the process.

113.    The Agency has issued Mr. Arden a 2026 Performance Plan that is similarly unrealistic and unattainable, continuing the pattern of setting him up for failure through manipulated performance standards.

114.    Mr. Arden explicitly stated his belief that these continuing adverse actions are occurring because of his current EEO case pending before the EEOC, writing to Agency leadership on January 7, 2026: "I strongly believe this is happening to me because of my EEO Complaint that is before the Equal Employment Opportunity Commission now. The actions I've been experiencing in the past seven months are no less than reprisal and retaliation for making my complaint."

115.    These continuing retaliatory actions constitute materially adverse employment actions because they would dissuade a reasonable employee from engaging in protected EEO activity and have materially affected the terms and conditions of Mr. Arden's employment.

**N. Cat's Paw Liability: Ms. Gonzales Used Management as Her Instrument of Retaliation:**

116.    Ms. Gonzales is a biased actor with clear, demonstrable unlawful retaliatory animus against Mr. Arden. She was disciplined with a Letter of Reprimand (later reduced to a Letter of Counseling) specifically because of testimony that Mr. Arden, Mr. Davis, and Mr. Zemke provided in the Davis EEO investigation. Ms. Gonzales had an obvious motive to retaliate against those who testified against her.

117.    Ms. Gonzales could not take adverse action against Mr. Arden herself—she had no supervisory authority over him and no power to initiate investigations, issue discipline, or affect the terms and conditions of his employment. However, she could, and did, manipulate her friend in management to do it for her.

118.    Ms. Sherrill and Mr. DeSilva served as Ms. Gonzales's instruments in reopening the investigation of Mr. Arden. Even if they claim they had no personal retaliatory intent toward Mr. Arden—that they were just doing their jobs or following up on a recommendation—it does not matter under the cat's paw doctrine. The Agency is liable because it allowed itself to be used as Ms. Gonzales's instrument of retaliation.

119.    Ms. Gonzales's biased act—lobbying her friend Ms. Sherrill to investigate those who testified against her—was the proximate cause of the adverse employment actions taken against Mr. Arden. But for Ms. Gonzales's intervention, the investigation would never have occurred because Mr. Cunningham had already declined to pursue it.

## COUNT I

## **<u>RETALIATION IN VIOLATION OF TITLE VII</u>**

120.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

121.    Title VII of the Civil Rights Act of 1964, as amended, prohibits employers, including federal agencies, from retaliating against employees who oppose unlawful employment practices or who participate in EEO proceedings. 42 U.S.C. § 2000e-3(a).

122.    Mr. Arden engaged in protected activity, including when he provided evidence and testimony in support of Mr. Davis's EEO complaint alleging race discrimination and harassment by Ms. Gonzales, as well as filing his EEO complaint with ORMDI and the EEOC.

123.    The Agency, through its management officials including Ms. Sherrill, Mr. DeSilva, Ms. Croall, and others, was aware of Mr. Arden's protected activity.

124.    Following Mr. Arden's protected activity, the Agency subjected him to materially adverse employment actions, including but not limited to:

a.    Initiating a sham investigation targeting Mr. Arden based on Ms. Gonzales' phantom complaint that was never formally filed, that Mr. Cunningham deliberately declined to pursue, and that was ultimately determined to be unwarranted;

b.    Threatening Mr. Arden with insubordination charges if he refused to participate in the sham investigation;

c.    Coercing Mr. Arden to participate in the investigation against his will;

d.    Harassing and intimidating Mr. Arden to compel his cooperation in the investigation;

e.    Isolating and ostracizing Mr. Arden from his colleagues, causing co-workers to avoid him out of fear of retaliation;

f.    Removing Mr. Arden from leadership communications and distribution lists;

g.    Excluding Mr. Arden from strategic planning meetings, informational meetings, and other meetings he should attend as a supervisor;

h.      Stripping Mr. Arden of his supervisory duties by reassigning all of his subordinates to a non-supervisor without Human Resources approval;

i.      Blocking Mr. Arden's advancement opportunities to GS-15 positions;

j.      Forcing Mr. Arden to learn of important decisions through contractors rather than through his chain of command; and

k.      Reducing Mr. Arden to a supervisor in name only;

l.      Changing Mr. Arden's Performance Plan in May 2025 to impose unrealistic and unattainable standards bearing little correlation to his position description;

m.      Repeatedly shuffling Mr. Arden between work groups and reassigning his subordinates multiple times since July 2025, making it impossible to achieve his performance objectives;

n.      Reducing Mr. Arden's performance rating from Outstanding (which he received for five consecutive years) to Fully Successful without any prior feedback or counseling;

o.      Closing out Mr. Arden's annual evaluation on January 6, 2026, without discussion and while he was on sick leave, depriving him of an opportunity to participate in the evaluation process; and

p.      Issuing a 2026 Performance Plan that is similarly unrealistic and unattainable.

125.    There is a causal connection between Mr. Arden's protected activity and the adverse actions taken against him. The retaliatory campaign was orchestrated by Ms. Sherrill at the instigation of Ms. Gonzales—the person disciplined based on Mr. Arden's testimony—who harbored clear retaliatory animus against those who testified against her.

126.    The Agency's stated reason for the investigation—that it was implementing the Whittington Recommendation (d)—is demonstrably false because Mr. Cunningham, the deciding

official, deliberately chose not to adopt that recommendation before his departure in February 2022.

127.    An unadopted recommendation cannot constitute a legitimate, non-discriminatory reason for the 2023 investigation. The Agency cannot credibly claim it was following a recommendation that its own predecessor official chose not to follow.

128.    The decision to pursue the investigation in 2023 was a new management action, made at the instigation of an individual with clear retaliatory motive, targeting the very employees who had engaged in protected EEO activity.

129.    Even if Ms. Sherrill and Mr. DeSilva lacked personal retaliatory animus, they acted at Ms. Gonzales's instigation. Ms. Gonzales had clear retaliatory motive against those who testified against her, and her request directly caused management to initiate the investigation against Mr. Arden.

130.    Additional circumstantial evidence supports an inference of pretext, including: (a) suspicious timing—the investigation was initiated nearly two years after the underlying events, and only after Ms. Gonzales specifically requested it; (b) known procedural defects—management acknowledged timeliness problems from the outset yet proceeded anyway; (c) selective targeting—the investigation targeted only those individuals who had provided testimony against Ms. Gonzales; and (d) abandonment after EEO complaint—the investigation was abandoned only after Mr. Arden filed his EEO complaint, suggesting management recognized its impropriety once challenged.

131.    As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered damages including, but not limited to, emotional distress, mental anguish, humiliation, damage to

his professional reputation, lost career advancement opportunities, diminishment of his supervisory role, and other compensatory and consequential damages.

## COUNT II

### RETALIATORY HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

132.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs of the Complaint as if fully set forth herein.

133.    Title VII prohibits employers from subjecting employees to a hostile work environment in retaliation for engaging in protected EEO activity.

134.    Mr. Arden engaged in protected activity when he provided testimony in support of Mr. Davis's EEO complaint in 2021 and when he filed his own EEO complaint in 2023.

135.    Following Mr. Arden's protected activity, the Agency, through Ms. Sherrill, Mr. DeSilva, Ms. Croall, and other management officials, subjected Mr. Arden, because of his activities protected under Title VII, to a continuous and escalating pattern of harassment and abuse that was unwelcome and that Mr. Arden reasonably perceived as hostile and intimidating.

136.    The harassing conduct included, but was not limited to:

a.    Initiating and pursuing a sham investigation targeting Mr. Arden based on a phantom complaint that was never formally filed and that the Agency's own Office of People Science ultimately determined was "unwarranted;"

b.    Threatening Mr. Arden with disciplinary action for insubordination if he did not submit to the sham investigation;

c.    Systematically isolating and ostracizing Mr. Arden from his colleagues, causing co-workers to avoid him out of fear that associating with him would invite retaliation against them;

d.    Deliberately excluding Mr. Arden from leadership communications, email distribution lists, strategic planning meetings, and other forums necessary for him to perform his supervisory duties;

e.    Ignoring Mr. Arden's repeated requests to be restored to leadership communications, with Mr. DeSilva's team ultimately informing Mr. Arden that they were "directed not to add him back to the list;"

f.    Repeatedly shuffling Mr. Arden between work groups and removing and returning his subordinates approximately four times since July 2025, creating constant instability and undermining his ability to supervise;

g.    Excluding Mr. Arden from meetings while briefing contractors on organizational changes affecting his department, causing subordinates to question whether "contractors are leading the government individuals;"

h.    Imposing unrealistic and unattainable performance standards bearing little correlation to Mr. Arden's position description, setting him up for failure;

i.    Reducing Mr. Arden's performance rating from Outstanding (which he received for five consecutive years) to Fully Successful without any prior feedback, counseling, or opportunity to address alleged deficiencies;

j.    Closing out Mr. Arden's annual evaluation while he was on sick leave, deliberately scheduling any discussion for times when he was unavailable and finalizing his evaluation without his participation;

k.    Stripping Mr. Arden of his supervisory duties by reassigning all of his subordinates to a non-supervisor (Ms. Croall) without Human Resources approval, reducing him to a supervisor in name only; and

l.    Failing to respond to Mr. Arden's documented concerns submitted to HR and leadership, thereby ratifying and perpetuating the hostile environment.

137.    The harassment Mr. Arden experienced was taken because of his protected EEO activity. The retaliatory animus is evidenced by: (a) the temporal proximity between Mr. Arden's protected activity and the commencement of the harassment; (b) Ms. Sherrill's documented hostility toward everyone who participated in the Davis EEO matter, including Mr. Robinson and Ms. Allen; (c) the selective targeting of those who testified against Ms. Gonzales; and (d) the escalation of harassment following Mr. Arden's filing of his own EEO complaint.

138.    The harassment was sufficiently severe or pervasive to alter the terms and conditions of Mr. Arden's employment. Considering the totality of the circumstances, including the frequency, severity, and nature of the conduct, a reasonable person in Mr. Arden's position would find the work environment hostile and abusive. Mr. Arden subjectively perceived the environment as hostile, as evidenced by his contemporaneous complaints to HR and leadership and his documented statements attributing the conduct to retaliation for his EEO activity.

139.    The hostile conduct fundamentally altered the conditions of Mr. Arden's employment including by: (a) stripping him of his supervisory responsibilities; (b) isolating him from colleagues; (c) excluding him from information necessary to perform his duties; (d) damaging his professional reputation; (e) blocking his career advancement opportunities; (f) lowering his performance rating despite five consecutive years of Outstanding ratings; and (g) causing him significant stress, anxiety, and emotional distress.

140.    The Agency is liable for the hostile work environment because the harassment was perpetrated by supervisory and management officials, including Ms. Sherrill (CISO), Mr. DeSilva

(Chief of Staff), and Ms. Croall (Acting Department Chief), who had authority to take tangible employment actions against Mr. Arden.

141.    The Agency knew or should have known of the harassment and failed to take prompt and effective remedial action. Mr. Arden repeatedly reported his concerns to HR and leadership in writing, yet the Agency failed to investigate, failed to take corrective action, and allowed the harassment to continue and escalate.

142.    The harassment has created a demonstrable chilling effect on Mr. Arden's willingness to engage in future EEO activity, which is precisely the deterrent effect that the anti-retaliation provision of Title VII is designed to prevent.

143.    As a direct and proximate result of Defendant's retaliatory hostile work environment, Plaintiff has suffered damages including, but not limited to, emotional distress, mental anguish, humiliation, damage to his professional reputation, lost career advancement opportunities, diminishment of his supervisory role, and other compensatory and consequential damages.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff Russell Arden respectfully requests that this Court:

A.     Declare that Defendant's actions violated Title VII of the Civil Rights Act of 1964, as amended;

B.     Enter a permanent injunction enjoining Defendant, its officers, agents, employees, and all persons acting in concert with them from engaging in retaliation against Plaintiff;

C.     Order Defendant to expunge from Plaintiff's personnel file any and all references to the sham investigation and any adverse consequences thereof;

D.     Order Defendant to restore Plaintiff's supervisory duties, including the reassignment of his subordinates to his supervision;

E.    Order Defendant to ensure Plaintiff's inclusion in all appropriate leadership communications, distribution lists, and meetings commensurate with his position;

F.    Award Plaintiff compensatory damages, including damages for emotional distress, mental anguish, and humiliation, in an amount to be determined at trial;

G.    Award Plaintiff back pay, front pay, and lost benefits, including lost career advancement opportunities, in an amount to be determined at trial;

H.    Award Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k);

I.    Award Plaintiff pre-judgment and post-judgment interest; and

J.    Grant such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

DATED: FEBRUARY 16, 2026.

Respectfully submitted,

Nathaniel D. Johnson (MD Bar #14729)
The Employment Law Firm, LLC
3261 Old Washington Road, Suite 2020
Waldorf, Maryland 20602
Tel: (301) 715-8919
Email: ndjesquire@gmail.com
*Counsel for Plaintiff Russell Arden*